1

2

3                                                          **\*E-FILED 5/4/07\***

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                          SAN JOSE DIVISION

10

TECHNOLOGY LICENSING CORPORATION,              NO. C 01-04204 RS

11              Plaintiff,                     **OPINION AND ORDER**

12      v.

13   GENNUM CORPORATION,

14

              Defendant.

15   _____/

16                        I.  INTRODUCTION

17         This action began when Technology Licensing Corporation ("TLC") sued Videotek, Inc. for

18   patent infringement.  The long and tortuous proceedings that followed are reflected in prior orders of

19   the court; those matters will not be recounted here.  Suffice it to say that in October of 2006, the

20   then-remaining parties appeared for a court trial,[1] with TLC denominated as the plaintiff and

21   Gennum Corporation denominated as the defendant.  TLC alleges infringement of two U.S. Patents,

22   Nos. 5,486,869 and 5,754,250.  Gennum contends its products do not infringe, and seeks declaratory

23   relief that the asserted patent claims are invalid or otherwise unenforceable.  Trial commenced on

24   October 16, 2006 and concluded on October 23, 2006. The parties then submitted post-trial briefing

25   _____

26         [1] At the outset of trial TLC renewed its objection that it was entitled to a jury.  That
     objection was overruled for the reasons set forth in the Court's order entered April 9, 2004, which
27   was upheld by the Federal Circuit's opinion denying TLC's petition for a writ of mandamus. *In re
     Technology Licensing Corp.*, 423 F.3d 1286 (Fed.Cir. 2005).  Similarly, the Court overruled TLC's
28   renewed objection that its proffered covenant not to sue divested the Court of subject matter
     jurisdiction, for the reasons set forth in the Court's order entered June 3, 2004.

1

United States District Court

For the Northern District of California

1 and proposed findings of fact and conclusions of law[2] before returning to present closing arguments

2 on January 19, 2007.

3        After carefully considering the sufficiency, weight, and credibility of the testimony of the

4 witnesses, their demeanor on the stand, the documentary evidence admitted at trial, and the post-trial

5 submissions of the parties, the Court finds no infringement as to the '869 patent, and further finds

6 that Gennum has failed to meet its burden of proof to show any claim of that patent to be invalid.  As

7 to the '250 patent, the Court finds that certain of Gennum's products would infringe the asserted

8 claims of the patent, but that those claims are invalid.  This Opinion and Order comprises the

9 findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

10

11                                    II. THE PARTIES

12        TLC is a California corporation formed by  J. Carl Cooper to hold various patents on which

13 he is the named inventor.  TLC does not manufacture or produce any product, but seeks to negotiate

14 license agreements relating to patents assigned to it by Cooper, who serves as TLC's general

15 manager.[3]  Cooper, as the inventor and as a principal of TLC, was TLC's primary witness at trial.

16 He gave testimony both as a percipient witness and as an expert in the field of technology in dispute.

17        Gennum is a Canadian company with its primary place of business in Ontario, Canada.

18 Gennum describes its business as designing, manufacturing, and marketing, "silicon integrated

19 circuits, modules and thin-film hybrid microcircuit components for a variety of applications in three

20 target markets:  video products, hearing instrument products, and data communications."  Gennum's

21 Proposed Findings of Fact and Conclusions of Law,  Docket No. 905 at A (2).[4]   Among other

22 _____

23        [2] Although this opinion differs substantially in form and substance from both parties'
proposed findings and conclusions, those submissions were nonetheless very helpful to the Court for
24 purposes of tracking and understanding the evidence and the parties' respective contentions.

25        [3] Prior to the formation of TLC, Cooper was associated with an entity known as Pixel
Instruments, Corp, which at that time apparently held an assignment of the patents-in-suit.  At the
26 time of some of the events described herein it may technically have been Pixel rather than TLC that
was asserting the patent rights relevant here.  For convenience, references to "TLC" shall include
27 Pixel, where applicable.

28        [4] Hereinafter "Gennum's Proposed Findings."  Similarly, TLC's Proposed Findings of Fact
and Conclusions of Law (Docket No. 907) will be referred to as "TLC's Proposed Findings."

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  products, Gennum markets and sells certain integrated circuits (chips) of its own design known as

2  the GS 4882 and GS 4982 (collectively "the '82 family of chips") and the GS 1881, GS 4881, and

3  GS 4981 (collectively "the '81 family of chips").  TLC accuses the '82 family of chips of infringing

4  certain claims of *both* patents-in-suit, and accuses the '81 family of chips of infringing certain claims

5  of the '250 patent.

6                                         III. THE TECHNOLOGY

7       The devices at issue in this action are "sync separators," as reflected in the titles of the two

8  patents-in-suit and in Gennum's names for its accused chips.[5]  In general, "composite" video signals

9  are signals transmitted over the airways or via cables, which allow television sets to reproduce

10 images and sounds that correspond to the images and sounds captured by  television cameras.  The

11 composite video signal comprises information encoded through variances in the voltage of the signal

12 over time.  The varying voltage conveys information as to how brightly each pixel on a television

13 screen should be illuminated.  Through processes that include mathematical conversions and the

14 effect of combining primary colors of light, the result is that a televison set can produce an image

15 virtually identical to the image captured by a television camera, whether that image is transmitted

16 "live" or stored in the interim on a medium such as video tape.

17      A televison set "paints" each picture on the screen one line at a time. Within the voltage

18 variances of a composite video signal, therefore, are "sync" signals or pulses, interpreted by the

19 televison receiver to determine when each new line of information begins and ends. Therefore, from

20 the outset of the television era, there have been "sync separators" capable of extracting sync signal

21 information from composite video signals.

22      Persons of sufficient age, however, may know from personal experience that extracting

23 reliable sync information is not always a simple matter.  Older televisions sets often included a knob

24 to adjust "sync," and many people can recall fiddling with such knobs until the picture stopped

25 "rolling" vertically or splitting horizontally.  Such rolling or image splitting was the result of the

26 ───────────────

27      [5] "Sync" is an abbreviated form of "synchronizing" and "synchronization." Both patents are
   entitled, "Synchronizing Signal Separating Apparatus and Method." Trial Exhibit ("TX") 1 and 2.

28 Gennum's data sheets for both its '82 and '81 families of chips label the products as "Video Sync
   Separators." TX 302 and 124.

                                                    3

television receiver miscalculating where each new line of picture content information began or ended. The evidence in this case is that such problems resulted from distortions in the video signal that could arise from any number of sources. The apparatus and methods claimed in the patents-in-suit are directed at eliminating or at least minimizing the effect of any such distortions or "noise" in the video signal, such that the sync signal extracted from a composite video signal is more reliable.

Similarly, Gennum's accused products are marketed as containing circuitry specifically designed to extract sync signal information with greater reliability. The '81 family of chips is marketed as "drop in" substitutes for what was apparently the industry standard chip, the LM 1881 offered by National Semiconductor,[6] but Gennum contends it offers "much improved performance." TX 304. The '82 family of chips is expressly touted as offering, among other things, "superior sync extraction in the presence of noise and varying sync pulse amplitudes." TX 302.

In the technologies discussed at trial, the process of sync separation includes at least two fundamental steps. First, because the overall voltage levels of an incoming video signal may vary, the "tips" of the sync pulses are first "clamped"[7] to a particular voltage level, by either adding or draining current from the signal. The sync signals are then "sliced"–in effect, measured or sampled–such that the circuitry can produce an output signal corresponding precisely in time with each sync pulse. Whereas the incoming composite video signal is an analog signal containing a variety of information, the sync separator outputs a "logic level" sync signal that is either high or low, depending on whether there is a sync pulse at a particular moment in time.

In the analog signal, the voltage levels of sync pulses do not rise or fall instantaneously. Represented graphically, this means that each sync pulse is shaped somewhat like a "V," but with a flat bottom.[8] As a result, if the timing of the pulses are measured from any point on the V to the same point on the next V, other than halfway down the V, the perceived timing of the pulses would

---

[6] The LM 1881 plays other roles in this case, as discussed below in sections IX (B) and X.

[7] The precise meaning of "clamp," "clamped," and "clamping" is a central point of controversy in this action and is discussed at greater length below. Nothing in this general overview of the technology is intended as a finding of fact or conclusion of law on those issues.

[8] As will be discussed below, the patents also relate to HDTV signals, which use a more complicated form of sync signals.

4

1   vary according to the amplitude of the pulses, which affects the degree of slope of each V.  To avoid

2   this problem, the sync separators are designed to "slice" each pulse at the "50% level," halfway

3   down the V.  Measuring at that level eliminates the variance caused by the slope of the V, much like

4   a pivot point that does not move.  Represented graphically, the logic level output of a sync separator

5   shows no sloped V at all–the voltage goes high or low virtually instantaneously with each sync

6   pulse.

7

8                                      IV. THE PATENTS

9        The '869 patent issued on January 23, 1996.  TX1, cover page.  Among other things, it

10  describes a sync separator apparatus and method that involves two separate clamps or clamping

11  operations, as will be discussed in greater detail below.  There is no dispute that Gennum's '81

12  family of chips utilizes only a single clamp, so TLC does not accuse the '81 family of infringing the

13  '869 patent.

14       The '250 patent issued on May 19, 1998.  TX2, cover page.  It relates to the same sync

15  separator technology described in the '869 patent, and some of the specification is identical.  Some

16  of the claims of the '250 patent, however, do not relate to the two-clamp aspect of the preferred

17  embodiment.  Accordingly, TLC accuses *both* Gennum's '81 family of chips and the '82 family of

18  chips of infringing certain claims of the '250 patent.

19

20                   V. INFRINGEMENT ANALYSIS AS TO THE '869 PATENT

21       A.  The Claims-in-Suit

22       TLC alleges infringement of the following claims:  independent claim 27 and its dependent

23  claims 29 and 30; independent claim 31 and its dependent claim 32; and independent claim 40.[9]

24  Both independent claims 27 and 31 have been construed as including "means-plus-function"

25  limitations, subject to 35 U.S.C. § 112, ¶6.  Independent claim 40 is a method claim.  As will be

26

27       [9] With few exceptions, the parties have not made arguments specific to the dependent claims.
     As the Court finds the independent claims are not infringed, it will not reach any contentions unique
28   to the dependent claims of the '869 patent.

                                            5

United States District Court
For the Northern District of California

explained below, TLC does not dispute that both claim 27 (and its dependant claims) and claim 40 include limitations that require two separate "clamps."  As to claim 31, TLC argues that Gennum's accused chips infringe through *either* of the two circuit elements that TLC contends perform a clamping function.  See TLC Proposed Findings at 40:27-41:2, *et. seq.*

TLC bears the burden of proving infringement by a preponderance of the evidence. *Cross Med. Prods., Inc., v. Medtronic Sofamor Danek, Inc*., 424 F.3d 1293, 1310 (Fed. Cir.2005). "To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed.Cir.1998) (citations omitted).  Additionally, "for a means-plus-function limitation to read on an accused device, the accused device must employ means identical to or the equivalent of the structures, material, or acts described in the patent specification. The accused device must also perform the identical function as specified in the claims." *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042, 1454 (Fed.Cir.1993); *see also Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (en banc) ("To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure *with the disclosed structure*, and must find equivalent *structure* as well as *identity* of claimed *function* for that structure.") (emphasis in original).

B.  TLC Has Failed to Establish that Gennum's "Hard Clamp" Provides a
    "Clamped Sync Portion" Within the Meaning of the Claims

As noted above, the sync separator apparatus and methods described and claimed in the '869 patent generally involve, among other things, using *two* circuits that "clamp" the sync tip to a known voltage.  For example, claim 27 calls for "circuitry . . . to clamp the sync tip thereof to a known level" *and* "circuitry for clamping . . . to provide a *second* clamped sync portion."  '869 patent, col. 17, lines 18-24.

There is no dispute that chips in the Gennum '82 family contain a so-called "soft clamp" that clamps the tip of sync in the manner envisioned by the patent.  The controversy is whether a so-called "hard clamp" in the Gennum chips also performs a clamping operation within the meaning of

6

the claims.  TLC contends the hard clamp *does* clamp the tip of sync in the manner claimed in the patent such that the hard clamp provides a first "clamped sync portion" and the soft clamp therefore provides a *second* "clamped sync portion."  Gennum asserts that the hard clamp is merely a "start up circuit" operating to increase the voltage of an incoming video signal when it is too low to be clamped by the soft clamp, and that the hard clamp never actually clamps the tip of sync.  As a result, Gennum contends, there is only one clamped sync portion generated in its chips–produced by the soft clamp.

Despite the parties' sharp disagreement as to whether the hard clamp performs a clamping operation within the meaning of the claims, there is no substantial dispute that the Gennum chip operates in the following manner:  Comparator C continuously compares the voltage of the video signal to a fixed voltage level $V_{HC}$.[10]  If and only if the voltage of the video signal is lower than $V_{HC}$, then additional current is output from comparator C, through diode D, into the circuit, thereby raising the level of the video signal.   In practice, the voltage level of the video signal will typically be lower than $V_{HC}$ only during start up conditions, although the situation could recur upon certain disruptions in the signal–hence Gennum's characterization of the hard clamp as a "start up circuit." If the voltage of the video signal upon startup is too *high* for the soft clamp to operate properly, other circuitry operates to bring it down.  If the voltage on start up happens to be within the parameters in which the soft clamp functions, then the soft clamp begins operating immediately.

Because Comparator C continuously compares the voltage level of the signal to $V_{HC}$, TLC insists it is inaccurate to refer to the hard clamp only as a "start up"circuit.  In TLC's view, the hard clamp is always part of the circuitry, and it is always performing a function, regardless of whether it is injecting additional current into the video signal.  Gennum, on the other hand, stresses that once the soft clamp is in operation, and particularly once "steady state" has been reached, the hard clamp "does not effect the functioning" of the soft clamp.  In Gennum's view, the hard clamp is "inactive" at such times.  Whether the hard clamp should be characterized as "inactive" or as continuously

---

[10]  The identifying letters used for circuit elements in this description come from a hand-annotated circuit diagram in the data sheet for the '82 family of chips, TX. 302A.  The pertinent portion of that diagram is reproduced on p.12  below.

7

United States District Court

For the Northern District of California

"monitoring" the signal is a debate of semantics more than of substance.   Regardless of how the hard clamp is described, there is no dispute that it only outputs current when the signal voltage is below $V_{HC}$ and there is no dispute that in normal operation such a condition will exist only for a limited period of time, most typically upon start up.

The question, therefore, is whether the hard clamp ever clamps the sync tip to a known voltage within the meaning of the claims.  TLC contends that clamping occurs in two ways that are within the claim language.  First, TLC argues that *at all times* when Comparator C is outputting current, the hard clamp circuitry is clamping the sync tip to a known level.  TLC asserts that it does not matter whether the tip of sync *has reached* or is being *held* at a known level, because "clamping" occurs whenever the hard clamp circuitry injects current for the purpose of forcing the tip of sync *towards* $V_{HC}$.  Thus, for example, TLC argues that the language in limitation A[11] of claim 27 – "circuitry . . . to clamp the sync tip thereof to a known level"– is satisfied whenever Comparator C is outputting current.

As a matter of grammar and word meaning, TLC's argument is plausible at first blush because the "to" preceding "a known level" could connote "towards," and further because "to clamp" could refer to the *process* of clamping rather than only to the end result.  The claim language, however, continues: " . . . thereby providing a *clamped* sync portion . . ." (emphasis added).  While it is possible to read "to clamp" as referring to a process of clamping that has not yet resulted in the sync tip reaching a particular level, the -ed ending of "clamped" can only refer to sync tips that have reached the "known level."  Accordingly, whether or not the Gennum hard clamp could be considered to be "clamping" the sync tip "to" (in the sense of "towards") $V_{HC}$ anytime there is current output from Comparator C, the operation of the hard clamp will not fall within the claims unless at some point it results in a "clamped sync portion."

---

[11]  The claim contains a preamble followed by four separate paragraphs.  This discussion will refer to those paragraphs as limitations A through D, respectively, although they are not labeled as such in the patent itself.  Additionally, the term "limitations" is used rather than "elements," because the Federal Circuit has noted that it "has moved towards the custom of referring to claim "limitations," reserving the word "elements" for describing the parts of the accused device . . . ." *Dawn Equipment Company v. Kentucky Farms Incorporated*, 140 F.3d 1009, 1014 n.1 (Fed. Cir. 1998).

**United States District Court**
For the Northern District of California

8

United States District Court

For the Northern District of California

1    To illustrate, Figure 3 of a Gennum data sheet for the '82 family of chips (TX 1006),

2  extensively reviewed by both parties at trial, includes what they agreed constitutes a graphic

3  representation of the sync tip over time during the operation of the Gennum chips.



Fig. 3   Dual Mode Input Clamp Operation during Start-Up
(Hard Clamp On)

21   In TLC's view, the four sync tips labeled (a) through (d) are being clamped "to" $V_{HC}$ even

22  though the voltage has not yet reached $V_{HC}$.[12]  That argument fails because during the (a) through (d)

23  sync pulses, no sync portion has yet been "clamped" to a known level.

24   TLC's second argument is that even if there is no clamping within the meaning of the claims

25  during the (a) through (d) pulses, this chart shows that the tip of sync *is* clamped to $V_{HC}$ at pulse (*e*).

[12]  Thus, in TLC's view, pulses (f) through (I) (and possibly (j) as well) would represent
clampings "to" $V_{SC}$.   There is no dispute that (k) through (m) represent sync tips that have been
"clamped" to $V_{SC}$.   The letter labels do not appear on the original trial exhibit, and have been added
here only for convenience of reference.

9

1   For this argument, TLC relies not only on Figure 3, but on other charts in evidence showing that

2   during operation of the Gennum chips the sync tip voltage may sometimes remain at or very close to

3   the $V_{HC}$ level for more than one sync pulse.  The evidence remains inconclusive, however, as to

4   when or under what conditions there would be a likelihood of more than one sync pulse at or near

5   the $V_{HC}$ level, nor did either party establish either the maximum or minimum number of pulses likely

6   to occur at that level during normal operation of the Gennum chips.  Indisputably, however, TLC

7   presented no evidence that there would ever be more than a very few pulses at the $V_{HC}$ level.

8       Moreover, from TLC's own descriptions of the operation of the Gennum circuitry, it is

9   apparent that the occurrence of multiple pulses at the $V_{HC}$ level would be a matter of happenstance

10  rather than design. TLC does not dispute that when the sync tip reaches the $V_{HC}$ level, the soft clamp

11  circuitry begins to inject additional current for the purpose of raising the voltage to the level of $V_{SC}$.

12  Although it appears that at least in some cases a few additional sync pulses at or near $V_{HC}$ may occur

13  before the effect of the soft clamp registers, the voltage level should rise above $V_{HC}$ very quickly if

14  the chip is operating as intended.[13]

15      The parties have quarreled as to which of them has the burden to establish what minimum

16  number of pulses at the $V_{HC}$ level might qualify as a clamping within the meaning of the claims, but

17  as Gennum appears to recognize, that is not the real issue.  Whether, in a particular instance, there is

18  one sync tip at or near $V_{HC}$, or two, or even several, or indeed none at all, does not change the fact

19  that once the $V_{HC}$ level has been reached, the soft clamp operates to inject additional current into the

20  signal.  The possibility that there is sometimes a real-world delay (in micro seconds) before the

21  *effect* of the soft clamp is measurable, does not change the reality that, under TLC's evidence, the

22  Gennum chips are not designed to, and do not, ever attempt to produce a "clamped" sync portion at

23  the level of $V_{HC}$.  Rather, the evidence shows that from the very instant (or as close thereto as

24

---

25      [13] Additionally, although the evidence similarly is not entirely clear on this point, it seems
    possible that in some instances of actual operation there will not even be *one* sync tip at the $V_{HC}$
26  level, because the soft clamp will have come into operation and sufficiently raised the voltage of the
    signal between the last tip of sync that was below $V_{HC}$ and the next sync tip.  TLC may be correct
27  that it need not prove the Gennum chips *always* infringe to prevail, but this further highlights the
    fact that sync tip at the $V_{HC}$ level is a matter of happenstance rather than design.  As will be
28  discussed further, this precludes finding that sync tip is ever "clamped" to the "known level" of $V_{HC}$.

10

United States District Court

For the Northern District of California

1  possible as a matter of physics) that the voltage of the signal reaches $V_{HC}$, the soft clamp will begin

2  injecting *additional* current to raise the voltage even higher.

3        The claim language requires circuitry that "clamp[s] the sync tip [of the video signal] to a

4  known level thereby providing a clamped sync portion." TLC does not, and could not, argue that the

5  "clamped sync portion" may be clamped to a voltage *other* than the "known level" referred to in the

6  first part of the clause; TLC's contention is that the signal is clamped, if only momentarily, to $V_{HC}$.

7  By TLC's own evidence and argument, however, upon the signal reaching $V_{HC}$, the Gennum soft

8  clamp injects additional current.  Put more simplistically, even if the hard clamp has *attempted* to

9  clamp the sync tip to $V_{HC}$, the moment it succeeds in doing so, the soft clamp "unclamps" the signal

10  and begins moving it to $V_{SC}$.[14]   As such, it simply cannot be said that the Gennum chips are

11  designed to or do in practice produce a "*clamped* sync portion" at the known level of $V_{HC}$, even if a

12  few pulses at that level sometimes occur in actual operation.

13        In essence, therefore, Gennum is correct that its '82 family of chips do not utilize two

14  "clamps" in the sense required by the claims of the '869 patent, notwithstanding the fact that the

15  chips are touted as having a "dual mode input clamp" and the fact that there is both a "hard clamp"

16  and a "soft clamp."  Accordingly, for this reason alone, TLC's infringement claims fail as to claims

17  27, 29, 30, and 40 of the '869 patent.[15]

18

19

20

21

22

---

23      [14]  TLC points out that the circuitry of the hard clamp in the '82 family of chips is identical to

24  the only circuitry in the '81 family of chips that provides a clamping function, by Gennum's own admission.  See '82 family design report, TX 23.0027 ("The clamp . . . is the same as that used in the

25  GS4881 family and therefore is not described herein.")  The fact that the circuit may be used to clamp the tip of sync to a known level when *not* used in conjunction with the soft clamp, however,

26  does not mean it operates to do so when there is also a soft clamp that "takes over" when the voltage reaches $V_{HC}$.

27      [15]  TLC does not dispute that independent claims 27 and 40 include limitations that require

28  two clamps.  The specific language of those claims, however, is described further in the following sections.  The claims depending from claim 27 incorporate its limitations by definition.

C.  Even Assuming the Hard Clamp Provides a "Clamped Sync Portion" Within
the Meaning of The Claims, TLC Has Failed to Establish Infringement

Referring to the schematic reproduced below, TLC contends that the hard clamp circuitry provides a (first) clamped sync portion in the following manner:  The video signal enters the circuitry at Video Input Pin 2, passes through elements A and B into Comparator C.  If the voltage entering Comparator C is less than $V_{HC}$, then Comparator C injects current out through Diode D into the circuit.  The result, TLC contends, is a first clamped sync portion that can be found at the output of the 2nd Order Bessel Filter B. [16]



Detail of TX 302A.0006, marked version of Figure 6 of the '82 family data sheet.

TLC further contends that the hard clamp circuitry generates a "a first logic level sync signal in response to said clamped sync portion" as follows:  The output of the 2nd Order Bessel Filter B (which, TLC contends, represents the first clamped sync portion) is routed to the two inputs of Comparator I.  One of the inputs of Comparator I receives current directly from the 2nd Order

_____

[16]  As explained above, TLC's argument that there is clamping within the meaning of the claims *before* sync tip reaches $V_{HC}$ is not tenable and the evidence shows that in fact there will never be more that a few sync pulses at the $V_{HC}$ level, if any.  In this section, however, the Court presumes for purposes of argument that if the hard clamp produces even a single sync tip at or near $V_{HC}$, that would constitute a "clamped sync portion" within the meaning of the claims.

12

Bessel Filter B; the other input of Comparator I receives the current through Integrated Hold E and the Resistor Divider J.  TLC claims that the resulting output of Comparator I is a first logic level sync signal that has been generated in "response" to the first clamped sync portion.

The preceding contentions, if accepted, presumably would satisfy limitation A of claim 27. As to limitation B of the claim, there is no real dispute that the soft clamp circuitry provides a "clamped sync portion," which, if TLC's arguments about the hard clamp were adopted, would therefore be a "*second* clamped sync portion."  The fatal flaw in TLC's position, however, becomes apparent  in connection with limitation C of claim 27.  That limitation requires circuitry that provides a "reference signal" that is a "response" *both* to the "first logic level sync signal" *and* to the "second clamped sync portion."  Under TLC's own contentions and descriptions of how the Gennum circuitry operates, however, the second clamped sync portion and the first clamped sync portion are found at different points in *time* at the same *place* in the circuitry–the output of the 2nd Order Bessel Filter B.

TLC graphically illustrated its contentions on this point in its demonstrative video clip ultimately admitted into evidence at I_869_82_Cl27_2_A of TX 167.[17]  As the clip begins, the output of the 2nd Order Bessel Filter B is labeled as "Clamped Sync Portion"–the same label it had in prior clips illustrating operation of the hard clamp.  As the representation of current flow through the soft clamp completes its first circuit, that label fades and is replaced with "2nd Clamped Sync Portion."

As a result, TLC's contention that the Gennum chips infringe limitation C of claim 27 cannot be reconciled with its own description of the operation of the circuitry.  TLC's demonstrative video clip related to limitation C is found at I_869_82_Cl27_3_A of TX 167.  It purports to show "at least one reference signal" being generated at the Resistor Divider J in response to both the "first logic level sync signal" found at the output of Comparator I, and the second clamped sync portion found at the output of the 2nd Order Bessel Filter B.  If, however, current is flowing through the soft clamp circuitry such that the output of the 2nd Order Bessel Filter B has become the second clamped sync

_____

[17] At TLC's request, and over Gennum's objections, demonstrative exhibits were admitted.

United States District Court

For the Northern District of California

portion, then under TLC's illustrations, that output no longer represents the *first* clamped sync portion. Accordingly, at that point in time, the output of comparator I necessarily is a response to the *second* clamped sync portion, not to the first clamped sync portion. Thus, the labeling of the output of Comparator I as the "First Logic Level Sync Signal" cannot be justified when the soft clamp is active, even if it is appropriate to so describe it when the hard clamp is active.

In short, because limitation C requires a signal that is responsive *both* to the "first logic level sync signal" (which, in turn, must be responsive to the first clamped sync portion) *and* to the "second clamped sync portion," the plain language of the claim requires that the first and second clamped sync portions co-exist temporally. Even accepting TLC's contention that the hard clamp circuitry produces a clamped sync portion for some meaningful period of time, under TLC's own descriptions of the operation of the Gennum chips, at any given point in time there is either a first clamped sync portion or a second clamped sync portion (or neither), but not both.[18]

The conclusion that the first and second clamped sync portions must co-exist in time flows not only from the language in the claim, but also from the specification. Prior to the assignment of this case to the undersigned, Claim 27 was determined by Judge Breyer to contain "means-plus-function" limitations. As such, the claim is to be "construed to cover the corresponding structure[s] . . . described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. As identified in Judge Breyer's claim construction order, the structures that perform the function of limitation A (providing the first clamped sync portion and the first logic level sync signal) are sync tip clamp 116 and sync slicer 118, shown in Figures 1 and 2 of the specification. The structure that performs the function of limitation B (providing the second clamped sync portion) is DC restoration device 110, shown in Figures 1, 2 and 3. The structures that perform the functions of limitation C are sync tip peak detector 120 and voltage divider 124, also shown in Figures 1-3.

---

[18] It is interesting to note that TLC's preliminary infringement contentions filed in this action pursuant to Local Patent Rule 3-1 appear to be word-for-word identical to a summary of infringement contentions TLC had previously provided to Gennum, with the exception that the preliminary infringement contentions omit an express reference to the fact that the two clamps "do not operate simultaneously." Compare TX 308.0002 with TX 301.0004.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

As shown in the figures and described in the text of the specification, these structures operate such that the two clamped sync portions exist simultaneously.

> The video signal amplified by input amplifier **102** is fed to sync pulse processing section **104** which includes a sync tip clamp **116** [and] a sync slicer **118** . . . . The video signal is first clamped by sync tip clamp **116** . . . . The clamped signal is then transferred to sync slicer **118** where the clamped signal is sliced . . . . The sliced signal is coupled to the sync tip peak detector **120** . . . .

> The amplified video signal from the input amplifier **102** *is also coupled to* DC restoration **110**. DC restoration **110** *clamps the amplified video signal* . . . . The DC restoration device **110** produces two output signals $V_{01}$ and $V_{02}$. The clamped video signal $V_{02}$ is delivered to the sync tip peak detector **120**.

> *In response to the sliced signal from the sync slicer **108**, sync tip peak detector **120** samples the positive and negative peaks of the synchronizing pulses of the clamped video signal* [i.e., $V_{02}$].

'869 Specification, col. 3, line 67-col. 4, line 67.

In other words, on an on going basis, sync tip peak detector 120 receives *both* the clamped and sliced signal from clamp 116 and slicer 118 *and* the clamped signal ($V_{02}$) from DC restoration device 110. The specification also describes the operation of these structures in further detail that demonstrate how both clamping operations operate contemporaneously and continuously. The slicing function of sync slicer 118 is implemented through comparator CP6, shown on Figure 2. Its output (the sliced sync pulses) is directed to the sync tip peak detector 120, where it is inverted by invertor I1. Sync tip peak detector 120 includes switch $SW_1$, which is "in the receipt of the signal $V_{02}$ output from the DC Restoration device 110." col. 7, lines 25-28. SW1 is normally tied to ground. "Only upon the arrival of the rising edges of the inverted pulses [from sync slicer 118]" does $SW_1$ activate to couple to a "hold" circuit consisting of R15 and C6. Thus, the sync tip peak detector *uses* the sliced sync pulses generated by the first clamping operation (sync tip clamp 116 and sync slicer 118) to sample the positive peaks of the pulses found in $V_{02}$–the second clamped portion generated by DC restoration device 110.[19] See also, col. 7, line 56-col.8, Line 34 and Figure 3 (explaining operation of DC restoration device 110 in more detail and concluding with statement that the (clamped) video signal output by DC restoration device 110 is "transferred to the sync tip

---

[19] Similar circuitry within sync tip peak detector 120 operates to sample the *negative* peaks at $SW_2$. Claim 27 does not require sampling both positive and negative peaks, however.

peak detector **120** where the video signal is sampled *in response to pulses from the sync slicer **118**.*")

The outputs of the sync tip peak detector are directed to the voltage divider 124, which operates to generate three "reference potentials." col. 9, lines 45-60.  Finally, comparator 122, compares the "reference potentials" of voltage divider 124 with $V_{01}$ (which, like $V_{02}$, is a clamped sync signal output by the DC restoration device 110) to produce logic level outputs.  col. 9, line 61-col.10, line 36

Not surprisingly, this description of the structures and their operation found in the specification, and traceable in Figures 2 and 3, corresponds neatly with the language in claim 27:

Limitation A: circuitry [Clamp 116] responsive to said sync portion to clamp the sync tip thereof to a known level thereby providing a clamped sync portion [at the output of OP5] and to generate [by operation of Slicer 118] at least a first logic level sync signal [at the output of CP6] in response to said clamped sync portion.

Limitation B: circuitry [DC Restoration Device 110] for clamping said sync portion to a known level to provide a second clamped sync portion.

Limitation C: circuitry [voltage divider 124 and sync tip detector 120] for providing at least one reference signal in response to said first logic level sync signal [output of CP6] and said second clamped sync portion [$V_{O2}$].

Limitation D: circuitry [comparator 122] for comparing said second clamped sync portion to said reference signal to provide said logic level version.

As set out above, TLC has not even argued that the hard clamp circuitry in the Gennum chip produces a first clamped sync portion (or a first logic level sync signal) that continues to be generated or to exist after the soft clamp is producing the "second" clamped sync portion.  Because the claims require the two clamped sync portions to co-exist in time, there is no infringement, even if TLC's contention that the hard clamp produces a first clamped sync portion were accepted.


D. Claims 40 Also Contains a "Two-Clamp" Limitation

As noted above, TLC does not dispute that independent claim 27 (and, therefore, its dependant claims 29 and 30) includes a limitation requiring two clamps.  The language of claim 27

16

to that effect has been discussed in detail in the preceding sections.  Claim 40, a method claim, also requires two separate clampings.  Claim 40 calls for steps including, "a) a *first* separation of said sync portion to generate a *first* separated sync signal, *including clamping* the sync tip of said sync portion to a known level . . ." and, "b) . . . *a second clamping* of said sync portion."  '869 patent, col. 20, lines 21-27.  Accordingly, TLC's infringement contentions fail as to claim 40 for the reasons set out in Section V (B) above.

Furthermore, claim 40 also contains the limitation that the two clamps operate at the same point in time.  Step (b) of the claim calls for generating at least one "level signal" that is "representative" of the *second* clamping but that is also "generated in response" to the *first* separated sync signal.  For the reasons set out in Section V (C) above, under TLC's own description of the operation of the accused Gennum chips, the "first" separated sync signal and the second clamping operation do not co-exist.  Accordingly, TLC has failed to show infringement as to claim 40.

E. <u>TLC Failed to Show that Gennum's "R$_{SET}$ Resistor" Infringes Claim 31</u>

Although TLC did not plainly distinguish independent claim 31 from claims 27 and 40 at trial, its post-trial submissions assert that infringement could be found *either* as a result of the operation of the hard clamp *or* operation of the soft clamp.   TLC refers to these as alternate "paths" of infringement.  See TLC Proposed Findings at 40:27-28 ("[t]here are two alternative paths of infringement, either one of which meets the claim language without the other.")  The second limitation of claim 31 calls for circuitry "to generate at least a first separated sync signal."  '869 patent, col. 17, lines 48-49. For the reasons set out above, the Court finds that the so-called hard clamp does not actually produce a "first separated sync signal" and therefore there is no infringement through that "path."

The soft clamp, however, undisputedly provides a "separated sync signal,"which, in the absence of a separated sync signal from the hard clamp would be a "*first* separated sync signal." Accordingly, the Court must proceed to analyze another claim limitation in dispute.

Claim 31 of the '869 patent describes an apparatus that includes, "circuitry to provide a format signal changeable in response to the format of said video type signal."  Judge Breyer

17

United States District Court
For the Northern District of California

1   construed this claim limitation to be a means-plus-function claim limitation within the scope of 35

2   U.S.C. § 112, ¶ 6, and identified the structure that performs the claimed functions as the video

3   standard detector 103 shown in Figure 1 of the patent.  Video standard detector 103 is a "black

4   box"–that is to say, nothing in the drawings or text of the specification describes its inner circuitry,

5   its components, or how to build or acquire one.[20]  The text of the specification, however, describes

6   the *functions* of the video standard detector in the preferred embodiment:

> The video standard detector **103** is provided for determining the video signal output
> from the input amplifier **102**. When the video signal, for example, is a NTSC video
> signal, video standard detector **103** controls switch $SW_L$, so that this switch is open,
> which indicates that the video signal is a NTSC TV signal. On the other hand, when
> the video signal output from the input amplifier **102** is a HDTV signal, the video
> standard detector **103** will turn switch $SW_P$ on. The video standard detector **103** also
> control switches $SW_T$, $SW_U$ and $SW_L$. The switches may be operated automatically in
> response to a video standard detector **103** which detects the type of signal **101**.
> Therefore, the synchronizing signal processing apparatus **100** in accordance with the
> present invention may process different video signals.

13   '869 patent, col. 4, lines 29-43.[21]

14      Were it necessary for the accused device to perform *all* of the functions that this structure

15   performs in the preferred embodiment, there could be no dispute that the accused Gennum chips do

16   not infringe.  Among other things, the Gennum chips cannot process HDTV signals at all.

17   The inquiry, however, is *not* whether the Gennum chips contain structure that can do *everything* that

18   video detector 103 does in the preferred embodiment.  The question is (among other things) whether

19   the accused chips can perform the functions specified in the claim under consideration.  *See Wenger*

20   *Mfg., Inc. v. Coating Machinery Systems, Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) (finding error

21   where trial court imported limitation into means-plus-function claim from additional functions of the

22   structure shown in preferred embodiment); *Chiuminatta Concrete Concepts, Inc. v. Cardinal*

23   *Industries, Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998) (holding that identification of "skid plate" as

24   structure corresponding to means-plus-function claim did not mean "additional structural aspects" of

25

26      [20] For that reason, Gennum also contends the claim is *invalid*, as discussed in the following
27   section.

28      [21] A few additional lines describing the operation of the switches are found at col. 5, lines
35-45.

18

preferred skid plate described in specification were "structure *corresponding* to the recited function."); *see also Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1375 (Fed. Cir. 2002) ("[i]t is irrelevant whether an element has capabilities in addition to that stated in the claim . . . .").

The claim under consideration calls only for a means (identified in the claim as "circuitry") that has the function of "provid[ing] a format signal changeable *in response* to the format of said video type signal." (emphasis added).  TLC contends that the Gennum '82 family of chips provides this functionality because the data sheets teach that the chips can be used with different video signal formats by selecting an appropriate resistance value for a resistor that is *external to the chips* when implementing the chip in a device. See TX 302 at p. 3  ("An external resistor $R_{SET}$, connected to pin 6 is used to set all timing currents in the device.")

In other words, a *human being*, can determine, *in advance*, the particular format of video signal with which a Gennum chip will be used, and human beings will then solder in place (or incorporate in other integrated circuits) a resistor of the appropriate value, external to the Gennum chip.[22]  In contrast, claim 31 describes an *invention*, not a human being, that can provide the function of providing a format signal "in response" to the format of the video signal.  Regardless of how the words of claim 31 are parsed, the mere fact that a Gennum chip *may* be used to process any *one* of a number of different format signals based on the value permanently selected for the external resistor $R_{SET}$, it cannot be said that the chip includes "circuitry to provide a format signal changeable in response to the format of said video type signal."[23]

---

[22]  At least in theory it might be possible to use the Gennum chips with a variable resistor–a potentiometer–or to construct a circuit with a number of different fixed value resistors and a means for switching between them.  There was no evidence that Gennum teaches doing so or that its chips are used that way in practice.  Even if they are, however, it would only make the differences between such structures and the claimed structure even more distinct.

[23]  In the preferred embodiment, the format signal is changed according to the position of certain switches, which "*may* be operated automatically in response to a video standard detector 103." '869 patent, col. 4, lines 30-40 (emphasis added).  As a result, TLC contends, claim 31 reads on devices in which the format signal is changed *manually*, and only dependent claim 33 (which is not asserted herein) adds the limitation of automatic switching of the format signal by video standard detector 103.  It is difficult to understand how manual switching would satisfy the claim language of "circuitry to provide a format signal changeable *in response* to the format . . . ."  A circuit containing manually-operated switches would be "changeable," but not *responsive* to the format.  Even

19

United States District Court
For the Northern District of California

1    Additionally, even if the Gennum chips could be characterized as providing the same

2  *functionality* claimed in the patent (and they cannot), that would not be the end of the inquiry.

3  Rather, "[i]f the identical function is performed, the next step is to determine whether the accused

4  device uses the same structure, materials, or acts found in the specification, or their equivalents."

5  *IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000).  As noted, the

6  "structure" disclosed in the '869 patent as performing the functions of claim 31 is only video

7  standard detector 103–a "black box."  TLC criticizes Gennum's expert witness for his inability to

8  provide a comparison between the accused structure and the structure disclosed in the patent, noting

9  his admission that, "he does not 'know what the structure of the video standard detector 103 is in the

10  preferred embodiment.'"  TLC Proposed Findings at 40:8-9 (citing Trial Tr. Volume 5 at 1098: 11,

11  17-20, October 20, 2006).   TLC misses the point.  It is simply not *possible* to say that Gennum's

12  chips use the "same" or "equivalent" structure as that described in the patent where the patent

13  describes no particular structure.  Although the Court concludes, for reasons set forth in the

14  following section, that Gennum has not met its burden to show that claim 31 is *invalid* based on the

15  description of video standard detector 103, TLC has failed to establish that, by teaching to vary the

16  value of the $R_{SET}$ resistor, Gennum directly or contributorily infringes claim 31 of the '869 patent,

17  either by providing the same function *or* with respect to using the same or equivalent structure.[24]

18

19              VI. VALIDITY ANALYSIS AS TO THE '869 PATENT

20    Gennum's only attack on the validity of the '869 patent is directed at claim 31 (and, by

21

22  assuming, however, that the "response" can be provided through human intervention and manual
23  operation of switches, TLC has failed to establish that the $R_{SET}$ resistor used in conjunction with
    Gennum chips provides the identical functionality or that it is the same or an equivalent structure.

24    [24] As noted above, a means-plus-function claim is *literally* infringed if the accused device
25  employs *identical or equivalent* structure.  TLC's contentions that the Gennum structures are either
    identical or equivalent to those in the patent have been rejected for the reasons stated.  TLC made no
26  meaningful attempt to establish non-literal infringement under the doctrine of equivalents.  In the
    case of means-plus-function claims, of course, a conclusion that an accused device does not employ
27  equivalent structure ordinarily precludes infringement under the doctrine of equivalents as well,
    unless the accused device represents later-developed technology, which is not the case here.  *See*
28  *Chiuminatta*, *supra*, 145 F.3d at 1310.  In any event, TLC has failed to establish infringement under
    the doctrine of equivalents with respect to any asserted claim of the '869 patent.

20

extension, dependent claim 32) and is based on the omission of any description in the specification of video standard detector 103, other than that noted in the preceding section.  Gennum contends the claim is thereby invalid under 35 U.S.C § 112, ¶¶ 1, 2 and 6, in that it, (a) lacks an adequate written description, (b) is not enabled, and (c) is indefinite.

"Because a patent is presumed to be valid, see 35 U.S.C. § 282 (1994), the party asserting invalidity has the burden of showing invalidity by clear and convincing evidence."  *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed.Cir.1999).  Gennum has not met that burden here.

Gennum has no quarrel with the principle that, "[a] patent need not teach, and preferably omits, what is well known in the art."  *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed.Cir.1987).  Gennum does not suggest that if a person of ordinary skill in the art would have known how to acquire or create circuitry to perform the functions of video standard detector 103 at the time the patent issued, Cooper would have nonetheless been required to provide further description in the specification to comply with any of the paragraphs of 35 U.S.C § 112.  Rather, Gennum's contentions of invalidity under each of the cited paragraphs of Section 112 all rest on its assertion that such circuitry was *not* commercially available and could not have been easily created by a person of ordinary skill in the art in 1992.

With due recognition that proving a negative often presents challenges, the Court concludes that Gennum failed to present sufficient persuasive evidence on this point.  Gennum's expert, Richard Kupnicki, testified that he did not "know of any hardware" available in the relevant time period that would perform the functions of video standard 103 detector as described in the specification. TR 1075:15-16.  Kupnicki, however, acknowledged that he had not done any research as to what was available at the time, and that his opinion was based only on his "experience" and on his understanding of the technical difficulties that would be involved. TR 1077:3-16.

It is not entirely clear from Kupnicki's testimony whether his conclusion would have been the same if he had been asked to consider only those functions expressly claimed in claim 31.  In its briefing, Gennum emphasizes that TLC pointed to no technology existing as of 1992 that involved detecting and distinguishing between HDTV "three level" signals and conventional "two level"

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  signals.   TLC responds to those arguments by noting that nothing in claim 31 itself calls for

2  circuitry capable of detecting or responding to HDTV format signals, and accuses Gennum of

3  improperly attempting to import a claim limitation from the preferred embodiment described in the

4  specification.  TLC points out that the functions of detecting and distinguishing among HDTV and

5  other formats are "separately claimed in non-asserted dependent claims 33 and 34."  TLC Reply at

6  6:23-24.  Gennum counters that claim 31 is a means-plus-function claim that *necessarily*

7  incorporates the structure identified in the specification.

8       As noted in the preceding section, not all aspects of a particular structure described in a

9  specification necessarily constitute "corresponding structure" for purposes of determining the

10  limitations inherent to a claim. *See Wenger*, *supra*,  239 F.3d at 1233; *Chiuminatta Concrete*

11  *Concepts, Inc. v. Cardinal Industries, Inc.*, *supra,* 145 F.3d at 1308. (Fed. Cir. 1998).  Conversely,

12  though, the mere fact that a dependent claim describes or claims some aspect of a structure with

13  more particularity will not foreclose finding that aspect also to be a limitation of the broader

14  independent claim.  *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.Cir.1991) ("means

15  for joining" in independent claim held to include "cross members" shown in structure described in

16  specification, notwithstanding dependent claim specifically requiring cross members.)  The critical

17  inquiry, therefore, is what functions are claimed in the particular claim at issue.

18       TLC flatly asserts that, as construed by Judge Breyer, claim 31, "does not require detecting

19  any video signal format, let alone detecting whether a video signal is of HDTV or analog format."

20  TLC Reply at 6:21-24.  Judge Breyer's construction, however, did not directly address the issue.

21  Rather, the claim was merely construed to be a means-plus-function claim, with the function of

22  "providing a format signal changeable in response to the format of a video type signal."  (i.e.,

23  virtually the exact wording of the claim), and having the corresponding structure of  "video standard

24  detector 103 in Figure 1."  See Claim Construction Order entered November 14, 2002 at 7:9-10

25  (Docket No. 158) (adopting, in part, proposed construction order filed September 27, 2002 (Docket

26  No. 120)) and said proposed order at 12:26-13:3.  Again, as discussed in the preceding section, the

27  claim calls for circuitry to provide a format signal that changes "in response" to the format of the

28  video signal, which would appear to undermine TLC's argument that there is no need to "detect" the

22

1   signal.[25]

2        Nevertheless, even assuming Gennum were correct as to the functionality implicated by this

3   claim, Kupnicki's testimony that he is not personally aware of hardware then existing to perform

4   those functions is insufficient to carry Gennum's burden to show invalidity by clear and convincing

5   proof.   Gennum's arguments that TLC failed to introduce evidence of any device capable of

6   performing all the functions described in the specification in connection with video standard detector

7   103 fail for at least two reasons: (1) it was Gennum's burden, not TLC's; (2) the question was not

8   whether such a device was already in existence at the time, but whether a person of ordinary skill in

9   the art would have known how to make one without undue experimentation. Viewing the evidence

10  as a whole, and taking into account the presumption of validity, the Court concludes that Gennum

11  failed to prove claim 31 is invalid.[26]

12

13              VII. "CONSTRUCTION" OF CLAIM 33 OF THE '250 PATENT

14        Claim 33 of the '250 patent is a method claim.   Limitation (c)[27] is a step that includes,

15  "selectively adding a current to [a signal] wherein the amount and/or polarity of said current is

16  responsive to [another signal] . . . ."    There has been no prior claim construction as to this

17  limitation, and Gennum contends the Court should engage in claim construction now.   TLC argues

18  that no claim construction *per se* is necessary, and that its meaning is clear from the language of the

19  claim.   In Gennum's view, TLC is treating this claim as if it contained the word "variable" prior to

20  the term "current."   Gennum argues that such a construction would be improper and urges the Court

21

22        [25] TLC's contention that the claim does not require detecting or distinguishing HDTV format
23  signals appears to be on somewhat more solid ground.

24        [26] It is peculiar that in a case so thoroughly litigated that the evidence was somewhat
    underdeveloped on this point.  Even though TLC knew that the burden was on Gennum, it is
25  unsettling that TLC apparently did not attempt to gather evidence to support Cooper's assertions as
    to what was known and available in 1992 until trial was underway.  Conversely, however, Kupnicki
26  apparently chose to rely on his general experience in lieu of some form of historical research.  It
    seems probable that more conclusive evidence–going one way or the other–likely exists. Without
27  such evidence, the determination must be made based on where the burden rests.

28        [27] Unlike the unlabeled claim limitations in the '869 patent discussed above, the '250 patent
    labels the four steps of claim 33 as (a) through (d).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   instead to construe the claim such that it would read on a method that adds a fixed amount of

2   current.

3        For the same reasons that Gennum contends it would be improper to insert the word

4   "variable" before current, it would be equally improper to add the phrase "fixed *or* variable," which,

5   in essence, is the construction Gennum is advocating. The issue, however, is not one of claim

6   construction.  TLC is correct that the language of the claim is sufficiently clear as it stands, and that

7   is the construction it will be given.

8        While Gennum has presented the issue as implicating claim construction, at heart, the

9   question is only whether a method that adds only a fixed current is within the scope of that claim

10  language, either for purposes of determining infringement or for evaluating whether the claim is

11  valid in light of the prior art.  As such, it would be improper to resolve that question as part of

12  construing the claim.

> A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device . . . [C]laims are not construed "to cover" or "not to cover" the accused device.  That procedure would make infringement a matter of judicial whim.   It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement.

17  *SRI Intern. v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1118 (Fed. Cir.1985).

18       Although not phrased in such terms, Gennum's argument essentially is that the language of

19  claim 31 "covers" a method that adds a fixed current.  That argument can be evaluated, but not as a

20  matter of "claim construction."

21       TLC is correct that a method that adds a current in a fixed amount would not infringe this

22  claim.  The feature of adding current in a "responsive" amount also provides a basis for

23  distinguishing this claim from prior art in which only a fixed amount of current was added.  This is

24  not the result of construing the claim as if it contained the word "variable," but the simple

25  consequence of the plain words of the claim.  As TLC points out, limitation (c) first calls for

26  "selectively *adding*" current.  In other words, current is either added, or it is not.  Then, however, the

27  claim requires that any current added be in an "amount and/or polarity" that is "responsive" to a

28  particular signal.  If a current is added in an amount that is fixed, the amount is not "responsive" as

24

required by the language of the claim.

Gennum argues that merely adding or not adding current, even in a fixed amount, satisfies the requirement that the current be "responsive." Gennum points out that the claim calls for the amount "and/or" polarity to be responsive and that polarity can only be one of two states (positive or negative). Gennum reasons that if polarity can be "responsive" when it can only be either positive or negative, then amount can be "responsive" if it is either off or on.[28] The flaw in this argument is that even though polarity can only be one of two states, there is a third possibility–if there is *no* current there is *no* polarity. This third "state" of polarity exists when current is *not* added to the signal, and the "amount" of current added is "none." Once current *is* "selectively added" to the signal, however, that current must have a polarity that is either positive or negative and an amount other than zero. For that amount to be "responsive" it cannot be always the same, non-zero, value.

Put differently, by saying that a fixed amount of current is "responsive" because it can be either "on" or "off," Gennum has overlooked the fact that the claim only refers to an amount of current that has been selectively added–i.e that is *not* "off." Again, the claim reads, "selectively adding a current . . . wherein the amount . . . of said current is responsive . . . ." If current has *not* been added, it has no amount. Thus, TLC is correct to argue, as it does, that a method using an "on/off" circuit to add current would meet the "selectively adding" condition of this claim, but it would not meet the requirement of "wherein the amount . . . is responsive."[29]

---

[28] Gennum notes that some devices may use circuits that change between "low" and "high," rather than "off" and "on." That possibility, however, does not affect the analysis.

[29] Despite its consistent advocacy that the limitation of claim 33 is met by circuitry that injects a fixed current amount, Gennum's Proposed Findings include a curious distinction in its descriptions of purportedly invalidating prior art references. In the case of three of the references, Gennum proposes a finding that the claim limitation is satisfied where the prior art device "sink[s] a small *nearly constant* current", "when required in response to the compared signal." Gennum's Proposed Findings at 51:17-19; 54:19-22; and 57:14-16. (Emphasis added). (In the case of a fourth prior art reference, the LM 1881, the circuit is simply described as satisfying the limitation by either injecting current or not. Gennum's Proposed Findings at 48:17-20.) In contrast, Gennum proposes that the Elantec prior art reference meets the claim limitation because "current is selectively added . . . in an *amount responsive* to the compared signal." Gennum's Proposed Findings at 59:11-14 (emphasis added). However inadvertent it may have been, the fact that Gennum's proposed findings match the actual claim language when describing the one piece of allegedly prior art that injects a variable current but depart from the claim language when describing prior art circuits with fixed current, further supports the conclusions reached in this section.

1    Again, this conclusion does not mean that the claim has been "construed" as if it contained

2    the word "variable."  Rather, the claim, on its face, requires that when a current is added (i.e., when

3    the current is on, not off), the amount of that current be "responsive" to another signal.[30]  As a matter

4    of *infringement* analysis, or in evaluation of prior art (rather than a matter of claim construction) it is

5    apparent that a circuit that adds a fixed amount of current is not within the scope of this claim,

6    because an unchanging amount of current cannot be said to be "responsive" to another signal.[31]

7

8                     VIII. INFRINGEMENT ANALYSIS AS TO THE '250 PATENT

9        A.  Claims 33-37

10    As discussed above, Gennum believes that claim 33 should be construed so as to read on

11    circuitry that injects a fixed amount of additional current.  Were Gennum's contentions on that point

12    accepted, Gennum would have no arguments to rebut TLC's claims that the '81 and '82 family of

13    chips meet all the limitations of claims 33 through 37 of the '250 patent.[32]  Gennum contends,

14    however, that if the Court accepts TLC's position as to the reach of claim 33 (as it has, in the

15    preceding section), then neither its '81 family of chips nor the hard clamp circuitry of '82 family of

---

16    [30]  While this conclusion appears from the plain language of the claim, it also is consistent
17    with the specification. Gennum argues that the specification does not expressly refer to a variable
      current being added and that, to the contrary, the description found at column 7, line 55 to column 8,
18    line 4 of the '250 patent, "is an 'on or off' description." Gennum Brief at 18:16-17. The drawings
      and text of the specification, however, disclose that "OP5" (sometimes mis-written in the
19    specification as "OPS") is an operational amplifier in a closed loop, with an output that varies
      according to the voltage of the video signal at its negative input.  See '250 patent, col. 7, lines 45-51;
20    Figure 2.

21    [31]  As part of its argument that this claim should be construed such that a circuit adding a
      fixed amount of current to would be within the meaning of the claim, Gennum points to prosecution
22    history that the word "responsive" was a replacement for earlier language calling for the current to
      be added in an amount "accurately corresponding" to another signal.  In making the amendment,
23    Cooper asserted to the Patent and Trademark Office ("PTO") that "responsive" was the "broader but
      better defined."  It is unclear why Cooper believed the term was "better defined" as it does not
24    appear to be defined anywhere in the patent or the prosecution history.   It probably is "broader" in
      that "responsive" seems unlikely to require as precise a correlation between the amount of current
25    added and the other signal as called for by the prior language.  Nevertheless, the mere fact that
      "responsive" is broader than the prior language does not change the conclusion that a current fixed
26    in amount cannot be considered "responsive."

27    [32]  Gennum advocates for a construction under which it would have no defense to
      infringement because it believes that construction necessarily would lead to a finding that the claims
28    are invalid in light of anticipatory prior art.

United States District Court
For the Northern District of California

chips infringe these claims.

Before turning to that contention, the Court notes Gennum has presented no evidence or argument directed at showing that the soft clamp circuitry of the '82 family of chips does not infringe these claims.[33]   As such, TLC's factual showing and legal assertions that the soft clamp circuitry of the '82 family of chips operates to infringe claims 33-37 of the '250 patent stands unrebutted and is sufficient to establish such infringement.  Thus, in the absence of a finding of invalidity as to those claims, or equitable estoppel or patent misuse, TLC would be entitled to judgment in its favor as to this issue.

As to the '81 family of chips and  the hard clamp circuitry in the '82 family of chips, Gennum contends there is no infringement under the position adopted by the Court in the preceding section because that clamp circuitry injects only a fixed amount of current.[34]  In an effort to prove otherwise, TLC points first to certain block circuit diagrams in Gennum's data sheets that appear to show the clamp as a "transconductance amplifier "–i.e. a circuit element that would have a variable output.  Gennum has shown, however, that the circuitry in its chips was not actually implemented using a transconductance amplifier.  Rather, the chips use a high gain voltage amplifier configured in an open loop.  When turned on, the amplifier outputs current that very quickly reaches a maximum amount as controlled by a current limiter.  Effectively, therefore, the current is either "off" or "on."

TLC quarrels with this description, pointing out that a "current limiter" only limits the *maximum* amount of current–it does not preclude the possibility that the Gennum chips inject variable amounts of current *below* that limit.  While that may be theoretically true, TLC has failed to prove that Gennum chips actually function other than as described by Gennum–when the amplifier is

---

[33] This does not appear to be an oversight.  Although Gennum has not expressly conceded infringement and has avoided drawing attention to this point, it is clear from its briefing and its Proposed Findings that Gennum understands it has advanced no argument that the soft clamp does not infringe.

[34] As noted above, the hard clamp in the '82 family of chips is the same circuit as the clamp in the '81 family.  Referring to the hard clamp as "clamp circuitry" here or elsewhere in this order should not be seen as inconsistent with the conclusion set out above that, when used as designed in the overall circuitry of the '82 family of chips, that circuitry never actually clamps sync within the meaning of the asserted claims of the '869 patent.

United States District Court

For the Northern District of California

turned on, the current reaches the maximum nearly instantly, thereby acting in essentially  an "on-off" fashion.

Finally, TLC also points to some other indications that the output of the Gennum clamps may have varying voltages under some conditions.  TLC has not explained, however, how or if any such variations are "responsive" to another signal in the manner required by the asserted claims of the '250 patent.  Accordingly, TLC has not met its burden to show that either the '81 family of chips or hard clamp circuitry of the '82 family of chips infringes.

B. <u>Claim 39</u>

Gennum contends there is no infringement of dependent claim 39 of the '250 patent even if claim 33 embodies the limitation of injecting a variable amount of current.  Claim 39 adds three steps to the method of claim 33 (or 34 or 35).  Gennum contends its chips do not meet limitation (f), which calls for "comparing said second compared signal of d) to said window signal."  TLC again argues there is infringement through two separate "paths."  First, TLC contends the sync signal from the sync slice comparator I is compared to the window signal BPEN at the AND gate 19, with pulses in the sync signal being selectively passed or blocked. See TX302A at p. 4.[35]  Gennum contends that the comparison at the AND gate is *not* between the sync signal and the BPEN signal, but is instead a comparison between the BPEN signal and a back porch pulse generated by the Back Porch Detector.[36]  Even assuming Gennum is correct that the limitation (f) is not thereby satisfied, Gennum has not rebutted TLC's showing that Gennum's chips meet the limitation through the *alternate* "path" found in windowing circuit  7.  Accordingly, in the absence of invalidity or unenforceability, TLC would be entitled to judgment in its favor as to this claim as well.

---

[35]  Although this portion of the circuitry is substantially similar in both the '81 and '82 families of chips, the '81 family of chips cannot infringe this dependent claim because those chips do not meet the limitation of claim 33, as set forth in the preceding section.

[36]  TLC acknowledges the existence of the Back Porch Detector, but downplays its role, asserting only parenthetically that the sync signal is "passed through the back porch detector."  See TLC Proposed Findings at 97:13-14, and repeated elsewhere.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1

2          IX. VALIDITY ANALYSIS AS TO THE '250 PATENT

3      A.  Gennum Has Not Shown Adding Variable Current to be Obvious

4          As discussed above, Gennum contends that claim 33 of the '250 patent is not limited to

5  circuitry that injects a variable amount of additional current.  In its post-trial briefing and Proposed

6  Findings, however, Gennum raised for the first time the contention that if the claim *is* so limited,

7  then the "invention" of using a variable current instead of the fixed current found in prior art is too

8  obvious to be patentable.  See Gennum's Proposed Findings § J (12); Gennum's Reply Brief at p.19

9  n.13.

10          A claimed invention is unpatentable if the differences between it and the prior art "are such

11  that the subject matter as a whole would have been obvious at the time the invention was made to a

12  person having ordinary skill in the art." 35 U.S.C. § 103(a); see *Graham v. John Deere Co.*, 383 U.S.

13  1, 13-14 (1966). The ultimate determination of whether an invention is or is not obvious is a legal

14  conclusion, but it is based on underlying factual inquiries including: (1) the scope and content of the

15  prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention

16  and the prior art; and (4) objective evidence of nonobviousness. See *Graham*, 383 U.S. at 17-18;

17  *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 877, (Fed.Cir.1993).

18          Here, Gennum has raised this issue of obviousness only after trial, and the record is

19  underdeveloped on the question. The only evidence to which Gennum points in support of the

20  contention is the fact that its own data sheets appear to show circuitry that would output a variable

21  current but, according to Gennum, its design reports show the products were built with a circuit that

22  outputs fixed current instead.  See Gennum Reply Brief at p. 19 n. 13.  The inference Gennum urges

23  be drawn is that persons of ordinary skill in the art would have known it was a simple matter to

24  substitute one for the other.[37]

25

26      [37]  Gennum's position might be stronger if it could show that its design originally called for a
27  fixed current circuit but that its engineers substituted a variable current circuit when the chips were
    built.  The fact that Gennum's chips do *not* use a variable current circuit despite some
28  documentation that suggests they do, arguably supports an inference that it was *not* obvious (to
    Gennum at least) to depart from the prior art.

29

United States District Court

For the Northern District of California

1    With so little evidence on point and virtually no analysis of the considerations applicable to

2    whether a claimed invention is obvious, Gennum has failed to meet its burden to establish clearly

3    and convincingly that use of a variable current would have been obvious to one of ordinary skill in

4    the art when the '250 patent issued.  Accordingly, Gennum has not established that claim 33 of the

5    '250 patent (or dependent claims 34, 35, 36, 37, and 39) are invalid under 35 U.S.C. § 103(a) for

6    obviousness.[38]

7

8    B.  Gennum Has Not Shown That Prior Art Other Than Elantec Anticipates the Claims

9    Gennum contends five references in the prior art meet every limitation of the asserted claims

10   of the '250 patent and thereby invalidate those claims.  See *Schering Corp. v. Geneva*

11   *Pharmaceuticals, Inc.*, 339 F.3d 1373, 1379 (Fed. Cir. 2003) ("a prior art reference [that] expressly

12   or inherently contains each and every limitation of the claimed subject matter anticipates and

13   invalidates.")  One of these references involves sync separator chips manufactured by Elantec, and is

14   discussed in the next section below.  The remaining references are: (1) the  LM 1881 sync separator

15   chip manufactured by National Semiconductor (as mentioned above, this chip appears to have been

16   effectively an industry standard); (2) the 1000 GG, a printed circuit board manufactured and sold by

17   Leitech  (Gennum's expert witness, Mr. Kupnicki, designed this product); (3) the ICG 7051, a

18   circuit (also designed by Kupnicki) incorporated in various products; and (4) the SCB-200N, a sync

19   color band generator made by Grass Valley that included a sync separator.

20   Gennum has shown, and TLC has not disputed, that each of these four references reflect

21   technology that was known and commercialized prior to any patent application that resulted in

22   issuance of the '250 patent, and that all of them therefore would qualify as "prior art."  It is also

23   undisputed, however, that each of these references involve circuitry that injects a *fixed* amount of

24   current rather than a variable amount of current.  For the reasons set out in Section VII above,

25

26   ────────────

27   [38]  The Supreme Court's decision this week in *KSR Intern. Co. v. Teleflex Inc.*,__ U.S.__,
     2007 WL 1237837 (April 30, 2007) does not compel a different result.  The *KSR* court rejected a
     "rigid approach" to evaluating obviousness and may have thereby generally lowered the bar for

28   alleged infringers attempting to establish obviousness, but it reaffirmed that the factors identified in
     *Graham* control the inquiry.

1    therefore, none of these references meet limitation (c) of claim 33.  As a result, Gennum has failed to

2    show that any of these references are invalidating anticipatory prior art.[39]

3

4              C.  Claims 33 Through 37 and Claim 39 of the '250 Patent Are Invalid

5              The four prior art references discussed above each involved circuits that inject a *fixed*

6    amount of current and which therefore do not meet limitation (c) of claim 33 of the '250 patent.  The

7    Elantec chips, which Gennum also contends are invalidating prior art, present a different issue.  TLC

8    has accused the Elantec chips of infringing the asserted claims of the '250 patent, and has

9    successfully negotiated a license agreement for their continued use.  Moreover, TLC presented no

10   evidence or argument at trial, in post trial briefing, or in its Proposed Findings directed towards

11   establishing that the Elantec chips do not meet all of the limitations of the asserted claims.

12   Accordingly, even under the "clear and convincing" evidentiary standard, Gennum's showing that

13   the Elantec chips meet all the limitations of the asserted claims is adequate.  See TX 263, 264; see

14   also Gennum's Proposed Findings 58:11-61:4 and evidence cited therein.

15             The only remaining question, therefore, is whether the Elantec chips constitute *prior* art–a

16   question that turns on the effective priority date of the asserted claims.[40]  There is no dispute that the

17   asserted claims were added in December of 1996  to a "continuation-in-part" ("CIP") patent

18   application that ultimately can be traced back to the same application that resulted in the issuance of

19   the '869 patent. Gennum contends that the added claims constituted "new matter," entitled to a

20   priority date no earlier than when the underlying CIP application was filed in 1995.  TLC, on the

21   other hand, contends it is entitled to the benefit of 35 U.S.C. § 120, which provides, in relevant part,

22   "[a]n application for patent for an invention *disclosed in the manner provided by the first paragraph*

23

24        [39]  The parties dispute whether all or any of these references also meet certain additional
     limitations found in the dependent claims.  In light of the conclusion that none of the references
25   satisfy the limitation of the sole independent claim, the Court need not decide those disputes.

26        [40]  TLC asserts that Gennum must prove by "clear and convincing" evidence that the claims
     are *not* entitled to the priority date TLC claims.  Even though the ultimate issue in this case is the
27   validity of the claims, TLC has not pointed to authority for the proposition that the "clear and
     convincing" standard applies when resolving the priority date issues.  The Court need not decide the
28   applicable standard, however, because the result would be the same under either the preponderance
     of the evidence or a "clear and convincing" standard.

31

United States District Court

For the Northern District of California

1   *of section 112* of this title in an application previously filed in the United States . . . shall have the

2   same effect, as to such invention, as though filed on the date of the prior application." (emphasis

3   added).

4         If, as TLC contends, the asserted claims of the '250 patent claimed an "invention" adequately

5   disclosed in the applications that led to the '869 patent, then there is no question that those claims

6   are entitled to a priority date that precedes the Elantec chips.  If, however, the asserted claims of the

7   '250 patent are *not* supported by the specification of the '869 patent, then the Elantec reference is

8   invalidating prior art.

9         The parties' sole dispute as to the adequacy of the disclosure in the '869 specification for the

10  asserted claims of the '250 patent centers on the phrase in claim 33 of the '250 patent: "or other

11  circuit."  In context, this limitation calls for circuitry "other" than a capacitor to perform the function

12  of establishing a "level shifted [video type] signal."  Gennum points out that when Cooper submitted

13  his amendment to the PTO adding this claim (and the associated dependent claims), he told the PTO

14  that the support for the claims appeared in Figure 16 of the patent, and he identified resistors 1604

15  and 1605 shown thereon as the corresponding structure.  Figure 16 was *not* included in the '869

16  specification;  as a result, Gennum contends, these claims necessarily constitute "new matter," not

17  entitled to the earlier priority date.

18        In response, TLC argues that resistors 1604 and 1605 are the *same* circuit components

19  labeled as R21 and R26 in Figure 3 of the '869 patent.  The problem with TLC's argument is that the

20  mere appearance of R21 and R26 in that drawing is insufficient to satisfy the written description

21  requirement of 35 U.S.C. § 112.  As Gennum points out, R26 is never mentioned in the text of the

22  '869 specification at all.  R21 (mistakenly referred to as "R1") is mentioned at col. 8, Line 20 of the

23  specification, but only to give its resistance value and location in the circuitry; there is no

24  elaboration as to its function or as to its relationship to R26.  Nowhere does the '869 specification

25  discuss the role either resistor may play to establish a level shifted video signal.  In contrast, a

26  portion of the '250 patent specification that indisputably constituted "new matter" describes these

27  resistors in greater detail to provide a clear link to claim 33: "The output of 1602 is coupled . . . to a

28  D.C. *level adjustment circuit* shown in this preferred embodiment as a *resistor network* 1604 and

32

1  1605." '250 patent, col.18, lines 5-9 (emphasis added). Thus, the new matter, unlike the '869

2  specification, specifically described both resistors working together to provide a level shifted signal.

3       "While it is true that . . . claimed subject matter 'need not be described *in haec verba*' in the

4  specification to satisfy the written description requirement, [citation] it is also true that the

5  requirement must still be met in some way so as to 'describe the claimed invention so that one

6  skilled in the art can recognize what is claimed.' [Citation.]." *University of Rochester v. G.D. Searle*

7  *& Co., Inc.*, 358 F.3d 916, 92-23 (Fed. Cir. 2004).  Here, if the new matter is disregarded, the only

8  "support" for claim 33 is the fact that R21 and R26 appear in one of several circuit diagrams and that

9  there is a passing reference to R21 (albeit mislabeled) in the text.  While it may be possible that a

10  person of ordinary skill in the art could study Figure 3 and determine that R21 and R26 might have

11  the *effect* of establishing a level shifted signal, there is nothing from which anyone could determine

12  with any confidence that R21 and R26 were the "other circuit" being claimed.[41]

13       As a result, claim 33 and its dependent claims are entitled to a priority date no earlier than

14  June 22, 1995, when the underlying CIP application was filed.   Although that does not, in itself,

15  render the claims invalid, there is no dispute that the Elantec data sheets are dated in 1993 and that

16  those products existed then. See TX 263 and TX 264.   Accordingly, the Elantec chips are prior art,

17  and serve to invalidate the asserted claims of the '250 patent.

18

19                                    X. INEQUITABLE CONDUCT

20       Gennum contends the '250 patent is unenforceable for inequitable conduct because Cooper

21  did not disclose the LM1881 prior art reference to the PTO during the prosecution proceedings.  To

22  prevail on an inequitable conduct defense, an accused infringer must prove by clear and convincing

23  evidence that the patentee withheld material information from the PTO, and that the information was

24  withheld with the intent to deceive.  *See GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1273 (Fed. Cir.

25

26       [41]  Indeed, apparently it is even disputable that R21 and R26 perform as required by claim 33.
    Gennum argues that the signal produced by those resistors is substantially altered before it is
27  compared to a known reference, as called for by limitation (b) of the claim.  The Court need not
    decide that issue, but the existence of the dispute further supports the conclusion that absent the new
28  matter in the text of the specification of the '250 patent, it would not be possible to determine what
    was being claimed by the phrase "or other circuit."

**United States District Court**
For the Northern District of California

2001). Additionally, "[i]nequitable conduct entails a two-step analysis: first, a determination of whether the withheld reference meets a threshold level of materiality and intent to mislead, and second, a weighing of the materiality and intent in light of all the circumstances to determine whether the applicant's conduct is so culpable that the patent should be unenforceable." *Id.*

TLC argues that Gennum has made *no* showing that Cooper *intentionally* withheld the information from the PTO. Indeed, Cooper testified unequivocally that he did not do so. As the *GFI* court pointed out, however, "the facts in inequitable conduct cases rarely include direct evidence of admitted deceitful conduct." 265 F.3d at 1274. Here, Gennum has pointed to circumstantial evidence from which, Gennum contends, a strong inference of intent should be drawn.

It is clear from the evidence that the LM1881 was, effectively, the industry standard for conventional sync separator chips at the time. Cooper freely acknowledges he was familiar with it. In fact, as discussed in the next section, TLC was engaged in discussions with a Gennum customer that indicated it would switch from using a Gennum chip to using the LM1881 in the same time period that the asserted claims were added to the patent application. Under these circumstances, it is at least a little peculiar that it did not occur to Cooper that the LM1881 was relevant prior art that likely should be pointed out to the PTO.[42]

Even assuming sufficient evidence of intent, however, Gennum has failed to establish that the failure to disclose the LM1881 was material. There is no dispute that the patent application listed a Japanese patent, reference 58-186270 ("the Nippon reference"), as prior art, and that the PTO had before it an English translation of the abstract of that patent, as well as its circuit diagrams. TLC demonstrated, and Gennum made no effort to rebut, that every element of the LM1881 pertinent to the asserted claims of the '250 patent also existed in the Nippon reference.[43] Accordingly, while it might have been more *prudent* to disclose the LM 1881 as well, Cooper

---

[42] An inference of intent may also be drawn where a patentee withholds a reference and then makes "an argument for patentability that could not have been made had the art been disclosed." *GFI, supra*, 265 F.3d at 1275. In Gennum's view, that principle is applicable here because it sees the LM1881 as invalidating prior art. The Court has concluded otherwise, as set out in Section VII B above.

[43] Indeed, TLC showed that, if anything, the Nippon reference had *more* elements that were pertinent.

34

1  breached no duty by failing to do so.  *See Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d

2  1435, 1441 (Fed. Cir. 1991) ("a patentee has no obligation to disclose an otherwise material

3  reference if the reference is cumulative or less material than those already before the examiner.")

4

5                                                    XI. MISUSE

6          Gennum also contends that TLC engaged in patent misuse by persuading Ross Video, a

7  Gennum customer, to quit using the GS 4881 chip in its products.  At the time of the purported

8  wrongful conduct, the '250 patent had not yet issued, so TLC had no infringement claims against the

9  '81 family.  As a result, Gennum argues, persuading Ross Video not to use the GS 4881 chip

10  constituted misuse of both the '869 patent (by applying it to a non-infringing product) and the '250

11  patent (by treating it as if it issued some two years before it actually did.).

12          Patent misuse is an equitable defense to infringement that "arose to restrain practices that did

13  not in themselves violate any law, but that drew anticompetitive strength from the patent right, and

14  thus were deemed to be contrary to public policy."  *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d

15  700, 704 (Fed.Cir.1992).   The primary purpose of the defense, therefore, is "to prevent a patentee

16  from using the patent to obtain market benefit beyond that which inheres in the statutory patent

17  right."  *Id.*   The Supreme Court has explained that the doctrine of patent misuse bars a patentee from

18  using the "patent's leverage" to "extend the monopoly of his patent to derive a benefit not

19  attributable to the use of the patent's teachings," such as requiring a licensee to pay a royalty on

20  products that do not use the teaching of the patent.  *Zenith Radio Corp. v. Hazeltine Res., Inc.,* 395

21  U.S. 100, 135-36 (1969).   The "key inquiry is whether, by imposing conditions that derive their

22  force from the patent, the patentee has impermissibly broadened the scope of the patent grant with

23  anticompetitive effect."  *C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1372 (Fed.Cir.1998);

24  *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1001 (Fed.Cir.1986).

25          Even if Gennum had introduced sufficient evidence to support its contentions regarding

26  TLC's communications with Ross Video, it does not appear those communications could be

27  characterized as "patent misuse" in any sense that the doctrine is ordinarily applied.  As to the '869

28  patent, Gennum's theory is that TLC demanded that Ross Video pay a license fee or stop using the

1   GS 4881 chip when TLC  knew it had no infringement claim against that product.  Patent misuse,

2   however, typically involves some conduct other than a patentee claiming infringement without

3   reasonable grounds for doing so.  If the patentee has no basis for making an infringement claim,

4   ordinarily the person accused would be able simply to refuse to enter a license or to stop using the

5   accused product.  Patent misuse arises when the patentee *does* have *some* rights under the patent to

6   affect the business of another person, but the patentee uses those rights as *leverage* to obtain more

7   than what the patent provides.  For example, if Ross Video had been importing and using the '82

8   family of chips *and* the '81 family of chips and TLC had demanded royalties on the '81 family as a

9   condition to licensing the '82 family under the '869 patent, a more apparent claim for patent misuse

10  might arise.  In that circumstance, Ross Video would be forced to pay royalties on products

11  undisputedly outside the scope of the patent as a condition to being granted a license to use products

12  as to which the infringement claim was colorable.

13       Here, in contrast, by Gennum's own argument, there was not even a colorable infringement

14  claim at all under the '869 patent (and the '250 patent had yet to issue).  Ross Video, therefore, was

15  not put to a choice of the nature that patent misuse doctrine is designed to prevent.  All Ross Video

16  would have risked by continuing to use the GS 1881 chip without a license from TLC was the

17  prospect of defending a frivolous lawsuit, had TLC for some reason chosen to pursue the matter

18  notwithstanding its own view that GS 4881 did not infringe the '869 patent.[44]  The remedy for

19  frivolous lawsuits is Rule 11 or, in appropriate instances, malicious prosecution suits, not patent

20  misuse doctrine.

21       As to Gennum's argument that TLC's interactions with Ross Video constituted misuse of the

22  '250 patent, it is a peculiar notion that a party could "misuse" a patent that is not in existence.  While

23  it has been called patent misuse where a patentee seeks to collect royalties *after* the expiration of the

24

25

26

---

27      [44]  There is nothing in the record suggesting that TLC had any intent to litigate against Ross
        Video or anyone else over the '81 family of chips unless and until the '250 patent issued, and the
28      Court does not imply there is evidence TLC would file any suit without a reasonable basis for doing
        so.

United States District Court

For the Northern District of California

1  patent term,[45] it appears that in such cases the patentee and licensor have typically entered into the

2  royalty agreement at a time when the patent is in force.  Again, to the extent a party demands

3  royalties or demands that another cease using a product where no patent has yet issued, the other

4  party is not put to the type of choice that patent misuse doctrine normally guards against.  The other

5  party is free to ignore the demands.

6       Because patent misuse is an equitable doctrine, Gennum would not necessarily need to show

7  that the facts here fit precisely into the mold of situations in which it has been previously applied.

8  Nevertheless, because the *type of harm* that patent misuse doctrine is designed to prevent is not

9  present here even under Gennum's characterization of what occurred, its patent misuse defense fails.

10 *Compare also U.S. Philips Corp. v. International Trade Com'n*, 424 F.3d 1179, 1190 (Fed.Cir.

11 2005) (certain licensing practices not patent misuse where parties "were not 'forced' to 'take'

12 anything from [the patentee] that they did not want.")

13      Finally, even assuming a patent misuse defense were available to Gennum under its view of

14 the facts, it failed to introduce sufficient evidence to establish that, (1) TLC articulated to Ross

15 Video that use of the GS 4881 infringed any existing patent rights; (2) Ross Video decided to stop

16 using the GS 4881 as the result of any conduct of, or communications from, TLC, or even; (3) that

17 Ross Video in fact stopped using the GS 4881 or any other Gennum product.

18      The central piece of evidence on which Gennum relies is a memorialization of a phone call

19 between Cooper and the principal of Ross Video.  Cooper wrote in that note that Ross had claimed it

20 only used the GS 4881 and that it "also stated that they were going to start using the National 1881

21 instead of the Gennum part." TX 398.[46]  Between that note and some deposition testimony offered

22 as impeachment, it might be possible to draw an *inference* that TLC *may* have suggested to Ross that

23 it not use *any* Gennum chips.  On the whole, however, the evidence does not support a conclusion

---

25  [45] *But see Scheiber v. Dolby Laboratories, Inc.*, 293 F.3d 1014, 1017-18 (7th Cir. 2002) (collecting authorities critical of that rule).

26  [46] Gennum also relies on TX 311, a letter from TLC (then Pixel) purporting to confirm that
27  Ross Video had indicated it was no longer using the GS 4881.  Like TX 398, nothing in that letter proves that Ross Video's purported abandonment of the Gennum product was motivated by anything
28  TLC did or said.  To the contrary, at least one reasonable inference is that Ross Video made the switch (or at least represented that the switch had been made) *prior* to any contact from TLC.

United States District Court

For the Northern District of California

1    that events more likely than not unfolded in that fashion.  Rather, it appears more likely, even in

2    view of TX 398, that whatever TLC did or did not say about which Gennum chips it believed

3    infringed, Ross Video volunteered the information that it was switching (or had already switched)

4    from the only Gennum product it had ever used, thereby ending the discussion.

5        Furthermore, this was an affirmative defense, as to which Gennum had the burden of proof.

6    Gennum did not present evidence of its sales to Ross Video, nor offer any explanation as to why

7    such records would be unavailable.  The reasonable inference to be drawn is that nothing TLC said

8    or did had any appreciable effect on Ross Video's use of Gennum products.  Accordingly, even if

9    the affirmative defense of patent misuse applied to the facts as characterized by Gennum, it failed to

10   prove that patent misuse occurred.[47]

11

12                              XII. "EXCEPTIONAL CASE"

13       Each party contends that the conduct of the other in this litigation and the positions asserted

14   make this an "exceptional case," giving rise to a right to recover attorney fees.  As reflected in this

15   Opinion and Order the merits of the parties' respective positions were not so one-sided, in either

16   direction.  Neither side is entitled to recovery of attorney fees from the other.

17

18                              XIII. DAMAGES

19       Gennum contends that it is entitled to judgment in its favor "on TLC's damages claim"

20   because TLC offered no evidence of damages at trial.  Gennum's Proposed Findings at 105:6.  On

21   April 2, 2004, however, TLC notified Gennum and the Court that it would not seek damages at trial

22   for Gennum's alleged past infringement, but would only seek injunctive relief against future

23   infringement. Docket No. 782.  Gennum argues that TLC's unilateral withdrawal of its damages

24   claim is not dispositive because, as it asserted at the time, "Gennum does not, however, acquiesce in

25   either of TLC's attempted reservations. Moreover, the Pretrial Order is not modified by TLC's

26   _____

27       [47]  Prior to trial, Gennum had suggested that certain other conduct of TLC constituted patent
     misuse as well.  Gennum abandoned those arguments at trial and introduced no evidence to support
28   them.

                                        38

1    Notice of Withdrawal, and there is no ground to modify that Order stated in the Notice." Docket No.

2    787.  Gennum further asserted then, and contends now, that because its declaratory judgment action

3    seeks "to resolve all patent issues between it and TLC," the damages claim may be adjudicated

4    despite TLC's withdrawal.

5           Gennum's invocation of its own declaratory judgment claim is unavailing for two reasons.

6    First, nothing in that pleading specifically requested a declaratory judgment that TLC suffered no

7    damages.  Gennum did request a declaration of non-infringement, and an absence of damages would

8    flow from a finding of non-infringement, but that is different from what Gennum is requesting

9    now–a judgment in its favor based on a failure of proof.  Second, Gennum is expressly requesting

10   judgment "on TLC's damages claim," not on its own declaratory relief claim.

11          More fundamentally, Gennum successfully resisted TLC's efforts to have a jury trial in this

12   action by arguing that in the absence of a damages claim no jury right arose.  The opinion in *In Re*

13   *Technology Licensing Corp.* made clear that TLC's lack of the right to a jury flowed in large part

14   from its election to abandon all damage claims;  a decision that left TLC in the same position as a

15   patentee who, from the outset of litigation, "sought *only* to enjoin future acts of infringement."  423

16   F.3d at 1289.  Had TLC not sought damages at the outset of this litigation, Gennum would have no

17   basis even to argue that it was entitled to a judgment as to damages.  Because Gennum succeeded in

18   avoiding a jury trial based on the conclusion that TLC was in a position no different from a party

19   who sought only injunctive relief from the beginning, Gennum's argument that TLC should now be

20   treated differently from such a party must fail.

21

22                                     XIV. WITNESS CREDIBILITY

23          Each party suggests that the opposing witnesses were shown to have given knowingly false

24   or contradictory testimony.  The Court's evaluation of credibility is reflected in the analysis above,

25   but certain points bear additional comment.  On both direct and cross-examination, Cooper

26   demonstrated a tendency to interpret words and questions narrowly, and with hyper-technical

27   precision.  On cross-examination in particular, and when explaining apparent inconsistencies in prior

28   testimony, that tendency lends some support to Gennum's arguments that the testimony should be

**United States District Court**
For the Northern District of California

39

treated with a modicum of suspicion. Ultimately, however, Cooper's testimony generally appeared to reflect accurately his subjective beliefs as to the facts and the opinions on which he testified. Although, as shown by the preceding, the Court has not adopted all of those views, neither does it adopt Gennum's contentions that Cooper was an untrustworthy witness.

Conversely, the Court does not adopt TLC's arguments that Gennum's witnesses were untrustworthy. Again, the Court has not embraced all of the conclusions of Gennum's expert, Mr. Kupnicki, but it has no reason to question that Mr. Kupnicki subjectively believed in the accuracy and validity of the opinions to which he testified. Additionally, the Court rejects TLC's assertions that Gennum's witness Vasilis Papanikolaou "lied to the Court" and indeed, "that Gennum and its counsel knew the testimony to be false before calling him to the stand." TLC's Post-Trial Brief at 34:17-19. To the contrary, based on the substance of Papanikolaou's testimony and his demeanor on the witness stand, the Court concludes that he interpreted initial questions posed to him as relating only to his familiarity with Gennum design reports *in general*. His subsequent forthright admission on cross-examination that he had no involvement with the design of the '81 and '82 families of chips, and that he had not seen the design reports for those particular chips except in the course of pre-trial preparation, undercuts any inference that otherwise might be drawn that his earlier testimony was deliberately false.[48]

## XV. REMAINING ISSUES

### A. Other Parties or Claims

During the course of this litigation, Judge Breyer granted one or more motions to sever and stay claims that involved parties other than TLC and Gennum. The record is unclear as to the extent to which any such claims remain in dispute, or would remain viable in light of the findings and conclusions set out in this order. Accordingly, within 20 days of the date of this opinion and order, TLC and Gennum shall submit to the Court a joint letter brief, joined in by such other parties as may

---

[48] At most, Mr. Papanikolaou's admission on cross-examination somewhat weakened the foundation for admitting the design reports at issue as "business records." The Court remains satisfied, however, that those exhibits were properly admitted on that basis.

United States District Court
For the Northern District of California

1   wish to be heard, that sets forth their shared or respective contentions as to what, if any, claims or

2   issues remain to be resolved.

3

4       B.  Other Counterclaims of Gennum Against TLC

5           In 2004, when a trial date in this action first appeared to be imminent, Gennum filed a motion

6   for leave to file an amended counterclaim against TLC.[49]  Arguing, among other things, that it would

7   prejudice its right to proceed to trial, TLC opposed the motion.  Judge Breyer granted leave to

8   amend, but severed and stayed the "new" claims asserted by Gennum to minimize the prejudice to

9   TLC.  Pursuant to Judge Breyer's order, a new case number was opened for Gennum's amended

10  counterclaim, No. C 04-00604.  That case has now been transferred to the undersigned with the

11  written consent of the parties.

12          The counterclaim in Case No. 04-00604 is an amended version of the counterclaim herein.

13  As such, it includes: (1) averments that are substantially identical to the averments herein, (2)

14  averments that add additional factual *detail* to the claims herein, and (3) claims that are at least

15  arguably distinct from the claims made herein.  With respect to the first two categories, it appears

16  likely that this opinion and order would preclude further litigation under principles of *res judicata*.

17  It may or may not be the case, however, that this order and opinion completely disposes of all of the

18  matters alleged in the third category of averments made in the amended counterclaim.  Accordingly,

19  within 20 days of the date of this opinion and order, TLC and Gennum shall submit to the Court a

20  joint letter brief, setting forth their shared or respective views as to what, if anything, remains to be

21  resolved in Case No. 04-00604.  Such joint letter brief may either be part of or separate from the

22  letter brief required by the preceding section, and shall be filed both under this case number and

23  under No. 04-00604.

24

25

26

---

27      [49]  Technically, Gennum's proposed pleading was a third party complaint.  As noted at the
28  outset of this opinion and order, the parties eventually were denominated as "plaintiff" and
    "defendant;" hence the term "counterclaim" will be used for convenience.

*United States District Court*
For the Northern District of California

XVI.  CONCLUSION

In summary:

1.  TLC has not met its burden to show that the Gennum '82 family of chips infringes any of the asserted claims of the '869 patent.

2.  Gennum has not met its burden to show that claim 31 of the '869 patent is invalid.

3.  TLC has not met its burden to show that the Gennum '81 family of chips infringes any of the asserted claims of the '250 patent.

4.  TLC has met its burden to show that the Gennum '82 family of chips would infringe all of the asserted claims of the '250 patent, were those claims valid and enforceable.

5.  Gennum has not met its burden to show that either patent is unenforceable as a result of patent misuse or inequitable conduct.

6.  Gennum has not met its burden to show that the asserted claims of the '250 patent are invalid for obviousness, but Gennum has met its burden to show that those claims are not entitled to a priority date earlier than 1995, and that the claims are therefore invalid in light of the Elantec prior art.

7.  Gennum is not entitled to a judgment in its favor on the issue of damages, and neither party is entitled to recover attorney fees from the other.

Preparation and entry of such judgment  will be held in abeyance pending further briefing on the issues identified in section XV above.

IT IS SO ORDERED.

Dated:        May 4, 2007

RICHARD SEEBORG
United States Magistrate Judge

OPINION AND ORDER
C 01-04204 RS

United States District Court
For the Northern District of California

1   **THIS IS TO CERTIFY THAT NOTICE OF THIS ORDER HAS BEEN GIVEN TO:**

2   Lina M. Brenner     lmbrenner@duanemorris.com, bmcoffey@duanemorris.com

3   Michael A. Dorfman     michael.dorfman@kattenlaw.com, mary.picot@kattenlaw.com;
    ecfdocket@kattenlaw.com

4   Martin C. Fliesler     mcf@fdml.com, cakins@fdml.com; mme@fdml.com

5   James Allen Gromada     jgromada@kattenlaw.com

6   Daniel J. Herling     djherling@duanemorris.com

7   Gary R. Maze     grmaze@duanemorris.com,

8   J. Donald McCarthy     dmccarthy@jonesday.com, gcperez@jonesday.com

9   John Arai Mitchell     mitch@araimitchell.com

10  Timothy J. Vezeau     timothy.vezeau@kattenlaw.com, anne.rova@kattenlaw.com

11  Nicholas W. van Aelstyn     nvanaelstyn@bdlaw.com, ladams@bdlaw.com

12

13  Counsel are responsible for distributing copies of this document to co-counsel who have not
    registered for e-filing under the Court's CM/ECF program.

14

15  **Dated: 5/4/07**                              **Chambers of Judge Richard Seeborg**

16
                                                   **By:**        **/s/ BAK**
17

18

19

20

21

22

23

24

25

26

27

28

OPINION AND ORDER
C 01-04204 RS